**ORAL ARGUMENT NOT YET SCHEDULED**

No. 23-1069 (consolidated with No. 23-1071)

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

HEALTHY GULF, *et al.,*
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent,*

COMMONWEALTH LNG, LLC,
*Respondent-Intervenor.*

---

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

---

**JOINT FINAL REPLY BRIEF OF PETITIONERS
HEALTHY GULF, *et al.***

---

Counsel listed inside front brief cover

Dated October 27, 2023

Nathan Matthews
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5695
nathan.matthews@sierraclub.org

Rebecca McCreary
Sierra Club
1650 38th St., Ste. 102W
Boulder, CO 80301
(303) 449-5595 ext. 103
rebecca.mccreary@sierraclub.org

*Attorneys for Healthy Gulf, Center for Biological Diversity, Louisiana Bucket Brigade, Sierra Club, and Turtle Island Restoration Network*

Caroline Reiser
Natural Resources Defense Council
1152 15th Street NW, Suite #300
Washington, DC 20005
(202) 717-8341
creiser@nrdc.org

Morgan Johnson
Natural Resources Defense Council
1152 15th Street NW, Suite #300
Washington, DC 20005
(202) 289-2399
majohnson@nrdc.org

Jared E. Knicley
Natural Resources Defense Council
1152 15th Street NW, Suite #300
Washington, DC 20005
(202) 513-6242
jknicley@nrdc.org

*Attorneys for Natural Resources Defense Council, Inc.*

# TABLE OF CONTENTS

Table of Contents ...................................................................i

Table of Authorities ..............................................................ii

Glossary ..............................................................................v

Summary .............................................................................1

Argument ............................................................................4

    I.   Greenhouse Gases...........................................................4

        A.   Regulations Required FERC to Determine Whether Individual Environmental Impacts Are "Significant"...........4

        B.   The Record Does Not Support FERC's Claim That It Would Be Impossible to Determine Whether Greenhouse Gas Emissions Are Significant........................................8

    II.   Air and Environmental Justice Impacts ...........................11

        A.   FERC Failed to Take a Hard Look at Cumulative Air Impacts...............................................................12

        B.   FERC's Reliance on EPA's Significant Impact Levels was Arbitrary and Capricious.....................................16

    III.  Alternatives.................................................................20

        A.   Increasing the Efficiency of the On-Site Power Plant ........20

        B.   Limiting Storage Tanks to Commonwealth's Initially-Proposed Volume.....................................................24

        C.   Carbon Capture and Sequestration................................27

    IV.  Public Interest.............................................................30

    V.   Remedy......................................................................33

Conclusion ........................................................................35

# TABLE OF AUTHORITIES

## Cases

*Action on Smoking & Health v. Civil Aero. Bd.*,
713 F.2d 795 (D.C. Cir. 1983) ..............................................................14

*Am. Pub. Gas Ass'n v. Dep't of Energy*,
22 F.4th 1018 (D.C. Cir. 2022) ............................................................33

*Am. Rivers v. FERC*,
895 F.3d 32 (D.C. Cir. 2018) ...............................................................16

*Appalachian Voices v. FERC*,
No. 17-1271, 2019 WL 847199 (D.C. Cir. Feb. 19, 2019) ......................7

*Birckhead v. FERC*,
925 F.3d 510 (D.C. Cir. 2019) ......................................................21, 29

*Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*,
449 F.2d 1109 (D.C. Cir. 1971) ...........................................................17

*City of Boston Delegation v. FERC*,
897 F.3d 241 (D.C. Cir. 2018) .............................................................17

*Constellation Mystic Power, LLC v. FERC*,
45 F.4th 1028 (D.C. Cir. 2022) ............................................................14

*Ctr. for Biological Diversity v. FERC*,
67 F.4th 1176 (D.C. Cir. 2023) ..............................................................6

*Del. Riverkeeper Network v. FERC*,
45 F.4th 104 (D.C. Cir. 2022) ................................................................6

*Eagle Cnty., Colo. v. Surface Transp. Bd.*,
82 F.4th 1152 (D.C. Cir. 2023) ............................................................26

*EarthReports v. FERC*,
828 F.3d 949 (D.C. Cir. 2016) ..........................................................6, 10

*Envtl. Def. Fund v. FERC,*
   2 F.4th 953 (D.C. Cir. 2021) ..................................................... 33, 34, 35

*Food & Water Watch v. FERC,*
   28 F.4th 277 (D.C. Cir. 2022) ............................................................. 7

*Grand Canyon Tr. v. FAA,*
   290 F.3d 339 (D.C. Cir. 2002) ...................................................... 12, 14

*Gulf South Pipeline Co. v. FERC,*
   955 F.3d 1001 (D.C. Cir. 2020) ............................................................ 20

*Sierra Club v. FERC,*
   867 F.3d 1357 (D.C. Cir. 2017) (*Sabal Trail*) ..................... 14, 15, 16, 17

*United States v. Whitmore,*
   384 F.3d 836 (D.C. Cir. 2004) ............................................................. 19

*Vecinos para el Bienestar de la Comunidad Costera v. FERC,*
   6 F.4th 1321 (D.C. Cir. 2021) ............................................................. 31

*Williams Gas Processing-Gulf Coast Co. v. FERC,*
   475 F.3d 319 (D.C. Cir. 2006) ............................................................. 32

**Statutes**

15 U.S.C. § 717*b* ............................................................................. 7

15 U.S.C. § 717*r* ............................................................................. 19

**Regulations**

18 C.F.R. § 380.7 .......................................................................... 5, 7

40 C.F.R. § 1502.16 ......................................................................... 5

40 C.F.R. § 1508.1 ..................................................................... 12, 15

**FERC Orders**

*Interim GHG Policy*,
   178 FERC ¶ 61,108 (Feb. 18, 2022)........................................................9

*N. Nat. Gas*,
   174 FERC ¶ 61,189 (Mar. 22, 2021).............................................. 1, 8, 9


**Other Authorities**

National Environmental Policy Act Implementing Regulations
   Revisions, 87 Fed. Reg. 23,453 (Apr. 20, 2022)....................................15

# GLOSSARY

| | |
|---|---|
| Authorization Order | *Commonwealth LNG, LLC*, Order Granting Authorization Under Section 3 of the Natural Gas Act, 181 FERC ¶ 61,143 (Nov. 17, 2022), R.526 [JA001-089] |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FEIS | Final Environmental Impact Statement |
| FERC | Federal Energy Regulatory Commission |
| JA___ | Joint Appendix page(s) |
| $\mu g/m^3$ | Micrograms per cubic meter |
| NEPA | National Environmental Policy Act |
| NAAQS | National Ambient Air Quality Standards |
| P__ | Paragraph in a FERC order |
| R.___ | Administrative Record item |
| Rehearing Order | *Commonwealth LNG, LLC*, Order Addressing Arguments Raised on Rehearing, 183 FERC ¶ 61,173 (June 9, 2023), R.549 [JA090-152] |
| Terminal | Commonwealth LNG Terminal |

## SUMMARY

FERC's violations of law in this case are fundamental: refusing to make required findings, conflating distinct standards, ignoring important parts of the problem, and failing to provide a reasonable explanation for its decisions.

FERC violated NEPA by failing to determine and disclose whether the Commonwealth Liquefied Natural Gas Export Project's (the Terminal or Project) 3.6 million tons of annual greenhouse gas emissions are significant. NEPA requires agencies to address the significance of all impacts as part of an EIS. FERC's excuses for shirking that obligation as to greenhouse gases fall short. The record does not support FERC's claim that it was impossible to determine the significance of emissions. FERC offers no explanation for its refusal to follow the approach it used in *Northern Natural Gas*, 174 FERC ¶ 61,189 (Mar. 22, 2021), and conclude that the emissions here would clearly exceed any significance threshold FERC might adopt. Alternatively, FERC also fails to justify its refusal to use the social cost of carbon. Every prior case that has upheld FERC's refusal to use this tool rested on findings FERC declined to make here.

FERC also failed to take the required hard look at air quality. First, FERC's analysis ignored cumulative impacts. Specifically, NEPA required FERC to consider the possibility that even if the Terminal's incremental air pollution was not individually significant, the cumulative effects of total air pollution in the area (including the Terminal's) would be significant. FERC instead hinged its significance determination on the Terminal's incremental nitrogen dioxide impacts. As a result of its myopic approach, FERC disregarded cumulative effects even when total air pollution would exceed National Ambient Air Quality Standards (NAAQS). Second, FERC's analysis of incremental impacts was separately flawed because it relied on an EPA Clean Air Act permitting tool that was not intended to—and does not—answer the questions NEPA poses about air and environmental justice impacts.

FERC also failed to rigorously explore three design alternatives, rejecting them based on speculation rather than reasoned analysis or record evidence. A more efficient on-site powerplant could avoid 350,000 tons of carbon dioxide equivalent and 38 tons of nitrogen dioxide annually. FERC's sole justification for rejecting this alternative was speculation that it would increase wetland or habitat impacts. But

FERC does not dispute that it provided no discussion whatsoever of the extent of such impacts. At the same time, FERC rejected another alternative that would reduce wetland or habitat impacts by omitting a storage tank. Again, FERC relied only on speculation, this time that doing so would require the facility to shut down more often, with purported air pollution and operational consequences. But again, FERC provided no discussion of the frequency or severity of those consequences. And finally, FERC arbitrarily rejected carbon capture and sequestration as infeasible even though the FEIS admitted that FERC lacked sufficient information to do so.

These NEPA violations prevented FERC from determining whether the Terminal was contrary to the public interest, as required by the Natural Gas Act. FERC's public interest determination was also unexplained: two Commissioners acknowledged that they could not tell whether or how FERC weighed adverse environmental impacts in its analysis, and the other Commissioners did not resolve the ambiguity.

For these reasons, the normal remedy of vacatur is appropriate. FERC's interrelated failures raise serious questions about whether FERC will re-approve the facility at all, and if so, whether the design

will need to be altered. On the other hand, Commonwealth provides no
specific evidence of disruptive consequences from vacatur.

## ARGUMENT

## I.  GREENHOUSE GASES

As Healthy Gulf's opening brief explained, FERC violated NEPA
and the Natural Gas Act by failing to disclose whether it viewed the
Terminal's greenhouse gas emissions as a "significant" adverse impact,
*see* Opening Br. 26-37, and by failing to explain whether and how these
emissions factored into FERC's public interest balancing, *id.* at 68-71;
*see also infra* at 30-33. FERC's suggestion that no evaluation of
significance is required is incorrect. And nothing in the record supports
FERC's conclusion that it would be impossible to make a significance
determination.

## A.  Regulations Required FERC to Determine Whether Individual Environmental Impacts Are "Significant"

An agency cannot simply choose not to determine whether impacts
are significant. Council on Environmental Quality regulations require

4

an EIS to disclose the "significance" of impacts. 40 C.F.R.

§ 1502.16(a)(1). FERC's own regulations do as well. 18 C.F.R. § 380.7(a).

Indeed, FERC's regulations also require disclosure of "significant

environmental impacts of the proposed action that cannot be

mitigated." *Id.* § 380.7(d).[1] And FERC's practice is to make a

significance determination for all environmental effects, except

greenhouse gas emissions.

    FERC followed its practice (and the controlling regulations) here,

except for greenhouse gas emissions. For every other impact, FERC

either concluded that the impact was significant, FEIS 5-413 [JA397]

(visual impacts), concluded that the impact was insignificant, *id.* at

5-402 to -418 [JA386-402] (impacts to soils, groundwater, surface water,

wetlands, vegetation, wildlife, aquatic resources, essential fish habitat,

land use and recreation, socioeconomics, air quality, noise, and safety),

or made an equivalent determination, *id.* at 5-412 [JA396]

_____

    [1] Both 40 C.F.R. § 1502.16 and 18 C.F.R. § 380.7 define content
that must be included in the EIS, *after* the agency has made the
threshold determination that an EIS is required. *Contra* FERC Br. 45-
47.

(summarizing findings whether the Terminal was "likely to adversely affect" species protected under the Endangered Species Act).

None of the cases FERC cites hold that where an agency *could* determine whether an individual impact is significant, the agency nonetheless can refuse to do so. *Contra* FERC Br. 45. Instead, each case, if it addressed the issue, upheld FERC's decision, on that record, that it was *impossible* to determine whether a project's greenhouse gases were significant. *EarthReports v. FERC* held that, on the record there, FERC's rejection of the social cost of carbon was not arbitrary, and that petitioners had not identified any other method FERC could have used. 828 F.3d 949, 956 (D.C. Cir. 2016). In other cases cited by FERC, petitioners had waived arguments that could potentially distinguish *EarthReports*'s social cost of carbon holding, and did not identify other methods for assessing significance, so nothing disturbed FERC's determination that it was "*unable* to assess" impacts on climate change. *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1184 (D.C. Cir. 2023) (emphasis added); *accord Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 112 (D.C. Cir. 2022); *Food & Water Watch v. FERC*, 28

F.4th 277, 290 (D.C. Cir. 2022); *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at *2 (D.C. Cir. Feb. 19, 2019) (unpublished).

FERC does not dispute that a significance finding affects the rest of FERC's analysis. Opening Br. 35-38. FERC must more thoroughly investigate potential mitigation for significant impacts, *see* 18 C.F.R. § 380.7(d), and finding that an impact is significant should influence FERC's determination of what mitigation to require, *see* 15 U.S.C. § 717*b*(e)(3)(A), or whether the project is contrary to the public interest, *see id.* § 717*b*(a). *Contra* Commonwealth Br. 8-9. Here, for example, FERC cannot explain how it determined that an alternative that would reduce greenhouse gas emissions by up to 350,000 tons per year (or ten percent) "would not provide a significant environmental advantage," FEIS 3-48 [JA302], where FERC refused to conclude whether the 350,000 tons per year that could be avoided was a significant amount. *Infra* at 20-24. Nor can FERC explain how greenhouse gases factored in its public interest analysis. *See infra* at 30-33. FERC's refusal to make a significance finding thus not only violated NEPA, but also tainted the rest of its analyses.

The information FERC states that it provided for context does not substitute for a significance determination. FERC Br. 49-50. The adequacy of an EIS is not determined by how many pages it has, but by whether it answered the required questions. FERC failed to identify the stepping stones on the path to FERC's conclusion that the Commonwealth Terminal was environmentally acceptable as approved, despite its greenhouse gas impacts and the availability of alternatives that would have reduced them.

**B.  The Record Does Not Support FERC's Claim That It Would Be Impossible to Determine Whether Greenhouse Gas Emissions Are Significant**

The record also does not support the Rehearing Order's claim that making a significance determination for greenhouse gases was impossible. Rehearing Order PP40-41 [JA112-114].

Most simply, FERC could have followed the approach it took in *Northern Natural Gas*, 174 FERC ¶ 61,189 (Mar. 22, 2021). *See* Opening Br. 31-32.[2] There, FERC concluded that, although FERC had

_____

[2] FERC issued its opinion in *Northern Natural Gas* after the FERC orders reviewed in the cases FERC relies on here. *See* FERC Br.

not yet identified a significance threshold for greenhouse gases, the 315 tons per year of emissions at issue were clearly insignificant and below any threshold FERC could plausibly adopt. *N. Nat. Gas*, 174 FERC ¶ 61,189 PP29, 33. Similarly, here, Commonwealth's annual emissions of 3.6 million tons of carbon dioxide equivalent far exceed any significance threshold FERC might adopt—including the 100,000-ton-per-year threshold FERC previously proposed. Opening Br. 31-32; *see also Interim GHG Policy*, 178 FERC ¶ 61,108, PP93-95 (Feb. 18, 2022) (collecting other greenhouse gas thresholds, all at or well below FERC's proposal). FERC has never offered any argument as to why direct emissions of this magnitude—3.6 million tons per year—could possibly be considered insignificant. While FERC asserts, in a footnote, that *Northern Natural Gas* "does not help" Healthy Gulf, FERC offers no argument (beyond summarizing the decision) as to why not. FERC Br. 56 n.14.

In the alternative, FERC could have used the social cost of carbon. FERC misrepresents the record in arguing that its "reasoning"

---

45. None of those cases considered whether FERC could have followed the *Northern Natural Gas* approach.

regarding the social cost of carbon "has remained constant." FERC Br. 54. As Healthy Gulf explained, the record here differs materially from all cases that have upheld FERC's prior refusal to use this tool. Opening Br. 34 n.7. In each of those cases, FERC offered three distinct reasons for refusing to use the tool. *EarthReports*, 828 F.3d at 956. This Court held that FERC's rejection of the tool on these grounds was not arbitrary. *Id.* But even if FERC's reliance on these arguments was not unlawful, Healthy Gulf and others continued to argue that such reliance was misplaced and unwise. And FERC has, at least in part, been persuaded: in this and subsequent orders, FERC has abandoned the first two of the three *EarthReports* arguments. Opening Br. 33-34 & 34 n.7.

Here, FERC's sole argument for refusing to decide whether $3.6 billion in social costs is significant is the claim that no agency has identified a threshold for when monetized environmental harm becomes significant for NEPA purposes. FERC Br. 54 (citing Rehearing Order PP40-41 [JA112-114]). No court has held that this argument, standing alone, justifies a refusal to use the social cost of carbon to inform decisionmaking. And as Healthy Gulf has explained, it cannot. Opening

Br. 34-35. FERC offers no explanation as to why this type of judgment call is different or more difficult than the determinations FERC makes regarding the significance of other impacts.

FERC acted arbitrarily in claiming that it could not determine whether Commonwealth's greenhouse gas emissions were significant. Since FERC could make this determination, NEPA required FERC to do so.

## II.  AIR AND ENVIRONMENTAL JUSTICE IMPACTS

In their opening brief, Healthy Gulf showed that FERC's conclusion that the Terminal's air impacts would be insignificant violated NEPA for two independent reasons: FERC (1) conflated the incremental and cumulative effects from the Terminal's nitrogen dioxide emissions, Opening Br. 40-46; and (2) used an inapposite EPA standard as an effects threshold, *id.* at 46-52. FERC and Commonwealth provide no meaningful response to either failure.[3]

---

[3] FERC attempts to reframe Healthy Gulf's claims as solely about environmental justice impacts. *See* FERC Br. 57. But FERC's shortcomings are more fundamental: a failure to take a hard look at air impacts from nitrogen dioxide pollution. FERC's failure is exacerbated by the fact that environmental justice communities will bear the brunt of that pollution.

## A.  FERC Failed to Take a Hard Look at Cumulative Air Impacts

NEPA requires agencies to consider a project's incremental effects and cumulative effects. These are distinct inquiries. Thus, agencies must account for the possibility that even if a project's individual incremental impacts are insignificant, the cumulative impacts of all sources of pollution, including the project, could be significant. *See Grand Canyon Tr. v. FAA*, 290 F.3d 339, 345-47 (D.C. Cir. 2002); 40 C.F.R. § 1508.1(g)(3).

Neither FERC nor Commonwealth acknowledge—much less explain how FERC's approach was consistent with—this basic NEPA requirement. FERC concedes that it based its determination on "the Project's contribution to … potential exceedances" of the one-hour nitrogen dioxide NAAQS. FERC Br. 60. Because FERC found the Terminal's individual contribution to any such exceedance would be modest, it concluded that air impacts would be insignificant. *Id.* at 60; *see also* Commonwealth Br. 2 (arguing "the Project would not result in a significant cumulative impact on air quality, as its direct [nitrogen dioxide] emissions would be far below" FERC's chosen threshold).

FERC's approach violated NEPA by conflating incremental and cumulative effects. Opening Br. 42-46.

FERC's analysis is not saved by the fact that it, at times, relied on the NAAQS as a threshold for NEPA significance. *Contra* FERC Br. 59-62. Even assuming the NAAQS is a reasonable threshold for NEPA significance,[4] FERC applied this threshold inconsistently. For days when FERC's modeling showed no NAAQS exceedances, FERC concluded air impacts would be insignificant, regardless of how much the Terminal increased pollution levels nearby. *Compare* FEIS 5-416 [JA400], *with* FEIS 4-227, -231 [JA344, 348] (showing Terminal would increase pollution by almost 125 micrograms per cubic meter ($\mu$g/m³), compared to the NAAQS of 188 $\mu$g/m³). But when the modeling predicted NAAQS exceedances, FERC changed its tune: rather than apply the NAAQS threshold to conclude that cumulative impacts were significant, FERC asserted that impacts (cumulative or otherwise) were

---

[4] While Healthy Gulf believes below-NAAQS pollution levels can be significant for NEPA purposes, they do not challenge FERC's use of the nitrogen dioxide NAAQS as a significance threshold in this case. *See* Opening Br. 45 n.11.

insignificant because the Terminal's individual contributions to those NAAQS exceedances were small. *See* FERC Br. 60.

FERC "cannot have its proverbial cake and eat it too." *See Action on Smoking & Health v. Civil Aero. Bd.*, 713 F.2d 795, 800 (D.C. Cir. 1983). Having selected the NAAQS as a threshold for NEPA significance, FERC couldn't ignore that threshold when it was exceeded. *See Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1057 (D.C. Cir. 2022) (rejecting "internally inconsistent" reasoning). By doing so, FERC arbitrarily disregarded cumulative effects when air pollution (and related health effects) would be worst and violated NEPA's requirement that the Terminal's incremental effects not be "view[ed] in a vacuum." *See Grand Canyon Tr.*, 290 F.3d at 342.[5]

*Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017) (*Sabal Trail*), isn't to the contrary. In *Sabal Trail*, the Court upheld FERC's

---

[5] Commonwealth's argument that FERC's analysis complied with Clean Air Act standards for determining whether the Project would "cause or contribute to" a NAAQS violation is beside the point. *See* Commonwealth Br. 16-20. The Terminal's Clean Air Act compliance is not at issue here. *See* Opening Br. 48 n.12. What matters is whether the "cause or contribute" conclusion that FERC borrowed from the Clean Air Act process—which hinged entirely on the Terminal's individual "contribution to the potential NAAQS exceedance," Commonwealth Br. 18—satisfied NEPA's cumulative effects requirement. It did not.

assessment of air impacts when modeling showed total pollution levels would "remain below" the NAAQS. 867 F.3d at 1370 & n.7. But the modeling here predicted *hundreds* of NAAQS exceedances. *See* FEIS 4-231, H-5 to -16, App'x I fig.6 [JA348, 406-417, 419]. *Sabal Trail* had no occasion to address FERC's rationale here: that it could find cumulative pollution levels that would violate the NAAQS insignificant because the project's individual contribution to any such violation would be small.

Indeed, neither FERC nor Commonwealth have identified a case where a court has upheld a similar rationale. This is no surprise. FERC's position ignores that "individually minor" actions can, together, result in "collectively significant" effects. *See* 40 C.F.R. § 1508.1(g)(3) (defining "cumulative effects"). FERC's approach contradicts not only the text and purpose of the NEPA regulations, *see* 87 Fed. Reg. 23,453, 23,467 (Apr. 20, 2022), but also decades of NEPA precedent, *see* Opening Br. 40-41 (collecting cases from the D.C., Fourth, Fifth, and Ninth Circuits). By focusing only on how much the Terminal would contribute to NAAQS exceedances, FERC disregards cumulative effects when air pollution is highest and accounting for those effects is most important. FERC's "cumulative impact analysis left out critical parts of

the equation and, as a result, fell far short of the NEPA mark." *See Am.*

*Rivers v. FERC*, 895 F.3d 32, 55 (D.C. Cir. 2018).

## B.  FERC's Reliance on EPA's Significant Impact Levels was Arbitrary and Capricious

Even if FERC's approach to cumulative effects were somehow

reasonable, FERC fails to justify its use of EPA's Significant Impact

Levels as a NEPA effects threshold when the NAAQS would be

exceeded. As Healthy Gulf explained, the Terminal's compliance with

Significant Impact Levels under the Clean Air Act does not address

NEPA's distinct inquiries. Opening Br. 46-52. Rather than provide an

affirmative explanation for its reliance on the Significant Impact

Levels, FERC calls for deference. FERC Br. 62. But to enjoy deference,

FERC's methodology "must be reasonable and adequately explained."

*Sabal Trail*, 867 F.3d at 1368 (cleaned up). FERC hasn't met that basic

requirement.

The mere fact that the EPA develops Significant Impact Levels

under the Clean Air Act does not mean that FERC could automatically

rely on compliance with those levels to satisfy its NEPA obligations.

*Contra* FERC Br. 62-63. The D.C. Circuit rejected this type of

"abdication of NEPA authority to the standards of other agencies"
decades ago. *Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy
Comm'n*, 449 F.2d 1109, 1122 (D.C. Cir. 1971). FERC needed to explain
how its use of EPA's Significant Impact Levels answered the questions
NEPA posed. *See* Opening Br. 48-51. FERC has not and cannot do so.

FERC's reliance on *City of Boston Delegation v. FERC*, 897 F.3d
241 (D.C. Cir. 2018), is misplaced. *See* FERC Br. 63. In *Boston
Delegation*, the Court upheld FERC's reliance on another agency's
factual findings in the face of competing expert opinions about a specific
facility's safety. 897 F.3d at 255. Here, however, EPA has not weighed
in on whether the Terminal will have significant air quality effects
under NEPA. Nor are EPA's Significant Impact Levels intended to
answer that question, either in general or for environmental justice
communities.[6] *See* Opening Br. 49-51. Indeed, even in the Clean Air Act
context, EPA has cautioned that Significant Impact Levels aren't

---

[6] FERC's assumption that the Terminal would comply with all air
permitting requirements, *see* FERC Br. 64, is irrelevant. "[T]he
existence of permit requirements overseen by another federal agency or
state permitting authority cannot substitute for a proper NEPA
analysis." *Sabal Trail*, 867 F.3d at 1375 (citing *Calvert Cliffs*, 449 F.2d
at 1122-23).

dispositive. Opening Br. 11-13. Commonwealth paradoxically argues that FERC can rely on EPA's draft Significant Impact Levels for nitrogen dioxide but ignore EPA's cautions about the limits of those levels. *See* Commonwealth Br. 21-23 (claiming those limits—but not Significant Impact Levels themselves—"apply only to the permitting process"). FERC, for its part, ignores EPA's disclaimers about Significant Impact Levels altogether.

Critically, FERC and Commonwealth fail to respond to Healthy Gulf's arguments showing that Significant Impact Levels are not an appropriate effects threshold in a NEPA analysis.[7] They thus don't explain why a tool used to reduce administrative burdens in Clean Air Act permitting, *see* Opening Br. 11-12, is helpful (let alone dispositive) evidence under NEPA, *see id.* at 49-51. They don't confront the fact that Significant Impact Levels aren't intended to measure health effects, *id.* at 49, or that even relatively small additions to existing NAAQS

---

[7] Healthy Gulf's claim is not a "collateral[] attack" on EPA's interim Significant Impact Levels. *Contra* Commonwealth Br. 24. EPA developed Significant Impact Levels for use in the Clean Air Act context. Healthy Gulf challenges only FERC's use of it here, under NEPA. The validity of the Terminal's Clean Air Act permits is not at issue. *Supra* note 5.

exceedances increase risks for surrounding communities and make it harder to cure the violations, *see id.* at 47-48. And they don't explain how Significant Impact Levels meet NEPA's requirement to consider a project's context, including how environmental justice communities may be disproportionately susceptible to air pollution. *Id.* at 50-51. Given these undisputed mismatches, FERC's reliance on Significant Impact Levels as a NEPA threshold for air and environmental justice effects was arbitrary.

With little on the merits to defend FERC's use of Significant Impact Levels as a NEPA threshold, FERC and Commonwealth argue Healthy Gulf waived this claim. FERC Br. 62-63 n.16; Commonwealth Br. 14-16. But Healthy Gulf presented this argument in their rehearing petition before FERC, which is all the Natural Gas Act required. *See* 15 U.S.C. § 717*r*(b). Neither FERC nor Commonwealth identify any statute, regulation, or case that required more.[8] And neither FERC nor

---

[8] That FERC "looks with disfavor" on parties raising new issues at the rehearing stage, *see* Commonwealth Br. 15 (cleaned up), is not a rule against the practice. Nor does this Court's general rule against raising new issues when seeking discretionary rehearing from a panel opinion, *see id.* (citing *United States v. Whitmore*, 384 F.3d 836 (D.C. Cir. 2004)), apply to the statutory rehearing process before FERC.

Commonwealth distinguishes this Court's decision in *Gulf South Pipeline Co. v. FERC*, which held that when a party "indisputably raised the question … in its rehearing application," that party "satisf[ied] the [Natural Gas Act's] exhaustion requirement." 955 F.3d 1001, 1012-13 n.2 (D.C. Cir. 2020). Because Healthy Gulf raised their claim related to Significant Impact Levels in the rehearing petition, the claim is properly before this Court.

## III. ALTERNATIVES

### A.  Increasing the Efficiency of the On-Site Power Plant

The Terminal includes a 120-megawatt gas-burning electricity-generating plant. Healthy Gulf showed that this plant could be replaced with a more efficient, combined-cycle design, and that FERC's conclusion that doing so would not provide a substantial environmental benefit was arbitrary. Opening Br. 55-60. Specifically, FERC could not rationally conclude that the benefit of reducing air pollution was outweighed by the harm of increasing the Terminal footprint—potentially increasing impacts to wetlands and/or habitat—where FERC provided no discussion about the amount of additional wetlands or habitat that would be impacted, if any. *Id.* at 57-58.

20

FERC and Commonwealth do not dispute any material element of this argument. They do not dispute that the efficient-powerplant alternative would be technically and economically feasible. *See* Opening Br. 56. They do not dispute that it would reduce the Terminal's direct air pollution by up to 10%, *i.e.*, by up to 350,000 tons of carbon dioxide equivalent and 38 tons of nitrogen oxides per year. *Id.* at 57. They do not dispute that in prior cases where this Court has upheld an agency's dismissal of an alternative on environmental grounds, the agency quantified the respective environmental harm. *Id.* at 58. And they do not dispute that FERC failed to do so here, *i.e.*, that FERC provided no estimate of how much, if at all, this alternative would increase the Terminal's footprint. *Id.*

Instead, all that FERC argues is that it can prioritize some environmental impacts over others. FERC Br. 34. True. But FERC cannot make "a reasoned choice" about the tradeoffs between impacts, *id.* at 33 (quoting *Birckhead v. FERC*, 925 F.3d 510, 515 (D.C. Cir. 2019)), where, as here, FERC provides specific information about only one set of impacts. The problem is not that FERC failed to disclose "exactly how much additional space" the efficient-powerplant

alternative would require, *id.* at 32; it is that FERC provided *no* information, despite relying on the additional space to reject the alternative.

Commonwealth, on the other hand, argues about a *different* alternative not at issue in this litigation. Commonwealth Br. 28-30. Before FERC, Healthy Gulf made the separate argument that FERC should *also* consider a more extensive redesign, which would have replaced the gas-burning turbines in refrigerator units with electric motors, coupled with a larger power plant. R.533 at 18-20 [JA468-470]. FERC clearly grasped that this alternative was distinct. Rehearing Order PP21-26 [JA100-104]; FERC Br. 31. Commonwealth nonetheless raises arguments that only pertain to the electric-refrigeration alternative. The efficient-powerplant alternative at issue here would *not* entail "converting natural gas to electricity, then back to mechanical power." *Contra* Commonwealth Br. 29. As FERC recognized, that issue only applies to the electric-refrigeration alternative. Rehearing Order PP25-26 [JA102-104]. Similarly, it is the electric-refrigeration alternative that (purportedly) "would essentially double the Project's footprint." Commonwealth Br. 28. Commonwealth never provided an

estimate of the land that would be needed for the efficient-powerplant alternative. R.499 at Response 7 [JA249].

Instead, the *only* record evidence on that point is evidence that Healthy Gulf provided, showing comparable plants with footprints of around three acres. Opening Br. 57 (citing R.533 at 21-22 [JA471-472]). FERC questioned whether these examples were applicable here, but provided no reason for doubting them. Rehearing Order P26 [JA103-104]. And—more importantly—FERC did not provide its own estimate of how much land would be needed. *Id.*

It would be arbitrary for FERC to conclude that any additional harm to habitat or wetlands, no matter how small, always outweighs any impact to air quality, no matter how great. And FERC clearly does not believe this: FERC rejected a storage tank alternative based on its finding that avoiding three acres of impact to wetlands did not justify the potential (unspecified) increase in air emissions. *Infra* at 24-27. FERC could not make a reasoned choice between the proposed design and the efficient-powerplant alternative without information about the magnitude of the harms and benefits of each. Because FERC refused to seek out or consider such information here, FERC's conclusion that the

efficient-powerplant alternative would not provide a significant environmental advantage was arbitrary.

## B.  Limiting Storage Tanks to Commonwealth's Initially-Proposed Volume

The basic facts underlying Healthy Gulf's storage-tanks alternative are also undisputed. Neither FERC nor Commonwealth dispute that omitting a storage tank, which would still provide more capacity than Commonwealth initially proposed, would be technically and economically feasible. Opening Br. 60-61. Respondents assert that the additional tank's storage capacity provides some operational benefits, *e.g.*, FERC Br. 36, but neither contend that these unquantified benefits are essential. FERC does not dispute that omitting one tank could reduce the Terminal footprint by up to 2.3 acres. *Id.* at 39 (citing FEIS 3-46 [JA300]).[9] And Respondents admit that FERC did not estimate how much this alternative would increase air emissions. *See* Commonwealth Br. 33.

---

[9] Commonwealth's assertion otherwise, *see* Commonwealth Br. 31-32, is contrary to FERC's findings in the FEIS.

FERC's refusal to provide any information regarding this potential increase in air emissions precluded FERC from concluding that those emissions outweighed the environmental benefits of the five-tank alternative. FEIS 3-46 [JA300]. It is not "flyspecking" to point out that FERC provided no data or analysis to support its sole argument for its conclusion that this alternative did not provide a "significant environmental advantage." *Id.* at 3-25 [JA279]. This is especially so given the amount of habitat and wetlands saved by the five-tank alternative is similar to the amount FERC relied on to reject the efficient-powerplant alternative that would substantially reduce air pollution. *Supra* at 20-24.

Nor has FERC shown that it could not estimate additional emissions from the five-tank alternative. This alternative's impact on air pollution is a function of two inputs: how much more often a channel closure would require a shutdown and startup of Terminal facilities, and the pollution emitted during each shutdown and startup. *See* Opening Br. 62-63. As to the first input, FERC cited the number of channel closings in 2021, Rehearing Order P31 [JA106], but refused to investigate or discuss how many of these channel closings (if any) would

25

have required the Terminal to shut down with five storage tanks but not with six.[10]

FERC's brief (but not its orders) argues that FERC could not use the 2021 data to predict future closures. FERC Br. 38; *cf.* FEIS 3-46 [JA300]; Rehearing Order P31 [JA106]. FERC offers no data to support its post hoc implication that reasonable forecasting would be impossible. The mere existence of some uncertainty does not permit FERC to dismiss all forecasting as a fruitless "crystal ball inquiry;" indeed, NEPA requires "reasonable forecasting and speculation." *Eagle Cnty., Colo. v. Surface Transp. Bd.*, 82 F.4th 1152, 1178, 1180 (D.C. Cir. 2023) (cleaned up).[11]

---

[10] Of the 33 closures Commonwealth identified, 26 lasted less than 24 hours. R.265 at 37-39 [JA185-187]. None lasted more than 72 hours. *Id.* FERC contends that the sixth tank provides an additional "buffer" that "equates to approximately one day of operation." FERC Br. 36 (citing R.499 at Response 9 [JA251]).

[11] FERC's assertion that the six-tank design provides meaningful operational benefits, FERC Br. 39, collapses for a similar reason: FERC fails to disclose the nature of that flexibility or its necessity. Commonwealth's determination that an extra tank is worth it *to Commonwealth* does not speak to whether the operational benefit of the extra tank outweighs its environmental impact, or whether a modification would better serve the *public* interest.

Looking at the other part of the equation, FERC offers no excuse for its failure to estimate the emissions from a shutdown and startup event. *See* Opening Br. 63. There is no reason to doubt that FERC could estimate these per-event emissions. FERC's dismissal of the storage tank alternative on the basis of purported air impacts, when FERC provided no information about those impacts and did not dispute that information was available, was arbitrary.

## C. Carbon Capture and Sequestration

FERC also arbitrarily rejected a carbon capture and sequestration alternative for emissions from the Terminal's gas pretreatment facility. No one disputes that this alternative could reduce greenhouse gas emissions by roughly 500,000 tons per year. Opening Br. 65-66. FERC dismissed this alternative as infeasible, but now admits that it did not actually determine this. FERC Br. 42. Instead, FERC merely speculated that sequestration *might* be infeasible for Commonwealth, even though the neighboring CP2 facility had determined that sequestration was feasible and was pursuing this option. FERC acted arbitrarily by failing to investigate this issue or offer any explanation as to why an

27

alternative that was feasible for CP2 would not be feasible for Commonwealth.

FERC argues that Commonwealth could not use *existing* sequestration infrastructure. Rehearing Order P28 [JA104-105]. Multiple liquefied natural gas terminals have proposed to construct *new* sequestration infrastructure to enable carbon capture and sequestration. FEIS 4-399 [JA383]; R.198 at 16 [JA177]. This fact provides, at a minimum, prima facie evidence that it would be technologically and economically feasible for Commonwealth to do so as well. In particular, the CP2 project's proposal to build a new carbon dioxide pipeline and other sequestration infrastructure, shows the feasibility of sequestration near the Commonwealth Terminal. FEIS 4-398 to -399 [JA382-383]. FERC offers no rebuttal to this evidence of feasibility. Indeed, FERC does not identify *any* difference between the CP2 and Commonwealth projects that would indicate that sequestration may be more difficult for the latter. The sole distinction appears to be that CP2 proposed carbon capture and sequestration, and that Commonwealth did not. *See* Draft EIS 4-364 [JA202]; R.389 at 24-25 [JA237-238].

The FEIS stated that it would be infeasible for the Terminal to use existing sequestration infrastructure, but acknowledged that it may be feasible to use new infrastructure, including that proposed by CP2. *See* FEIS 4-399 [JA383]. In the Rehearing Order—the first and only place where FERC asserted that carbon capture and sequestration as a whole would be infeasible—FERC ignored the possibility of using new sequestration infrastructure, whether CP2's or parallel facilities constructed by Commonwealth itself, and instead only discussed existing sequestration infrastructure. Rehearing Order P28 [JA104-105].

At a minimum, FERC violated its NEPA obligation to affirmatively investigate and rigorously explore alternatives. While the FEIS asserted that FERC was "unable to evaluate" the feasibility of using CP2's sequestration site, FEIS 4-399 [JA383], NEPA does not permit FERC to cease its inquiry at the first sign of uncertainty. Instead, FERC must "at least *attempt* to obtain the information necessary to fulfill its statutory responsibilities," and "use its best efforts to find out all that it reasonably can." *Birckhead*, 925 F.3d at 520 (cleaned up). FERC made no such attempts, despite Healthy Gulf's

repeated insistence that FERC do so. R.389 at 24-26 [JA237-239]; R.533 at 23-25 [JA473-475].

And there is no reason to doubt that such an investigation would be fruitful. The FEIS identified various details of CP2's sequestration proposal that were unknown in 2022, FEIS 4-399 n.186 [JA383], but many of these details, such as the location of individual sequestration wells, are irrelevant to whether Commonwealth could utilize CP2's proposed sequestration infrastructure. Instead, it appears that the only pertinent questions are whether CP2's system could be designed with enough capacity to also serve Commonwealth, and whether it would be feasible to construct a pipeline connecting Commonwealth with the CP2 facility 1.5 miles away. Having failed to ask these questions, FERC's finding that carbon capture and sequestration was infeasible for Commonwealth was arbitrary and capricious.

## IV.  PUBLIC INTEREST

Healthy Gulf showed that the Commission's public interest finding under Section 3(e) of the Natural Gas Act was arbitrary and

30

capricious for two reasons. Opening Br. 67-71. FERC and

Commonwealth do not meaningfully rebut these points.

First, because FERC's NEPA analyses "were deficient, [FERC]

must also revisit its determinations of public interest" under the

Natural Gas Act. *Vecinos para el Bienestar de la Comunidad Costera v.*

*FERC*, 6 F.4th 1321, 1331 (D.C. Cir. 2021); *see* Opening Br. 68. Neither

FERC nor Commonwealth contest that a NEPA violation also

undermines the Natural Gas Act determination. FERC Br. 25-26;

Commonwealth Br. 35.

Second, FERC failed to reasonably explain its conclusion that

there was no "affirmative showing of inconsistency with the public

interest." Authorization Order P15 [JA008-009]; *see* Opening Br. 68-71.

FERC and Commonwealth claim that FERC's conclusory explanation

that Healthy Gulf had failed to overcome the presumption of public

interest is sufficient, and that the Natural Gas Act "demands no more."

FERC Br. 26-27; *see also* Commonwealth Br. 36. They are wrong.

FERC's actions under the Natural Gas Act are reviewed "under

the arbitrary and capricious standard of the [Administrative Procedure

Act]." *Vecinos*, 6 F.4th at 1331. As Healthy Gulf has explained, that

standard requires reasoned and transparent decisionmaking to allow for meaningful judicial review. Opening Br. 68, 70. Holding FERC to that established standard for its public interest determination would not constitute a "rewrite" of Section 3. *Contra* Commonwealth Br. 37. FERC and Commonwealth otherwise do not address how FERC's lack of framework or public interest analysis meets these basic requirements.

Unlike any prior case, two Commissioners here explicitly stated that they did not know how FERC determined that the Terminal was not inconsistent with the public interest. Authorization Order, Glick Concurrence PP6-7 [JA074-075]; Rehearing Order, Clements Dissent P2 [JA148-149]. Neither the Authorization Order nor the Rehearing Order provided that missing information. Contrary to FERC's assertion, FERC Br. 27, this failure is a basis for overturning the order. How can an order be reasoned and adequately explained if half of the decisionmakers do not understand how the outcome was reached? *Cf. Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 328-29 (D.C. Cir. 2006) ("Arbitrary and capricious review strictly prohibits us from upholding agency action based only on our best guess as to what reasoning truly motivated it.").

In any event, the little reasoning the Authorization Order provides is arbitrary and capricious. FERC "must fully articulate the basis for its decision." *Envtl. Def. Fund v. FERC*, 2 F.4th 953, 968 (D.C. Cir. 2021) (cleaned up). Yet FERC admits that "some impacts would be permanent and significant," without explaining why these significant impacts do not reach the level of an "affirmative showing of inconsistency with the public interest." Authorization Order P15 [JA008-009]. And FERC doesn't address whether it considers climate impacts in this analysis at all, Opening Br. 69-70 (citing Rehearing Order, Clements Dissent P2 [JA148-149]), even though FERC acknowledged that Healthy Gulf had specifically argued the Terminal's contribution to climate change renders it contrary to the public interest. Authorization Order P11 [JA006]. Entirely failing to consider an important aspect of the problem is the very definition of arbitrary and capricious decisionmaking. *Envtl. Def. Fund*, 2 F.4th at 967.

## V. REMEDY

Vacatur is the "normal remedy" when agency action is found unlawful. *Am. Pub. Gas Ass'n v. Dep't of Energy*, 22 F.4th 1018, 1030 (D.C. Cir. 2022). Respondents thus bear the burden of showing vacatur

should not apply. *See Eagle Cnty.*, 82 F.4th at 1196 (vacating when respondents presented no argument that would justify "depart[ure] from our normal practice"). FERC and Commonwealth haven't met their burden here.

FERC's brief doesn't address remedy. Commonwealth provides only conclusory assertions, such as its claim that it is "plausible" FERC will reach the same result on remand. Commonwealth Br. 38. But FERC's errors are serious and compounding: FERC's failure to adequately assess greenhouse gas and air quality impacts contributed to its unreasoned rejection of alternatives that could ameliorate those impacts. It is thus "not at all clear" that FERC would, after taking a true hard look at those impacts and alternatives, reach the same outcome. *See Envtl. Def. Fund*, 2 F.4th at 976.

Nor does Commonwealth support its claims about disruptive consequences. While vacatur may cause some disruption to Commonwealth's plans, Commonwealth provides *no evidence* about the nature or extent of that disruption. Instead, Commonwealth offers only bare assertions that vacatur would "hurt its ability to timely commence construction" or meet contractual obligations. Commonwealth Br. 39.

Missing are the specifics the Court would need to understand how disruptive vacatur might be. Commonwealth is a sophisticated actor that (apparently) took on decades-long contractual obligations knowing vacatur was a potential outcome from this litigation. Accepting Commonwealth's (and only Commonwealth's) invitation to depart from vacatur in this case would encourage the type of build-first, analyze-later approach this Court disfavors. *Envtl. Def. Fund*, 2 F.4th at 976-77. The Court should reject Commonwealth's invitation, apply the normal remedy, and vacate the Authorization Order and final EIS.

## CONCLUSION

For the foregoing reasons, the Court should grant the petition and vacate the Authorization Order and final EIS.

Dated: October 27, 2023

Respectfully submitted,

*/s/ Nathan Matthews*
Nathan Matthews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org

Rebecca McCreary
Sierra Club
1650 38th St., Suite 102W
Boulder, CO 80301
303-449-5595 ext. 103
rebecca.mccreary@sierraclub.org
*Attorneys for Healthy Gulf, Center for Biological Diversity, Louisiana Bucket Brigade, Sierra Club, and Turtle Island Restoration Network*

*/s/ Morgan A. Johnson*
Morgan A. Johnson
Caroline J. Reiser
Jared E. Knicley
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington, DC 20005
(202) 289-2399
majohnson@nrdc.org
creiser@nrdc.org
jknicley@nrdc.org
*Attorneys for Natural Resources Defense Council*

36

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(g)(1),

I certify that the foregoing brief complies with:

1. the type-volume limitations of Rule 32(a)(7) because it contains 6,442 words, excluding the parts of the brief exempted by Rule 32(f); and

2. the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point) using Microsoft Word (the same program used to calculate the word count).

*/s/ Nathan Matthews*
Nathan Matthews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of October, 2023, I have served the foregoing Reply Brief for Petitioners Healthy Gulf, Center for Biological Diversity, Louisiana Bucket Brigade, Sierra Club, Turtle Island Restoration Network, and Natural Resources Defense Council on all registered counsel through the Court's electronic filing system (ECF).

*/s/ Nathan Matthews*
Nathan Matthews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org